**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THOMAS K. VAUGHAN, JR.,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | **No. 15-4845** |
| **v.** | : | |
| | : | |
| **THE BOEING COMPANY,** | : | |
| **Defendant.** | : | |

**MCHUGH, J.**                                                   **JANUARY 19, 2017**

## MEMORANDUM

This is an unfortunate case of a falling out between employer and employee.  Plaintiff
Thomas K. Vaughan, Jr., an African American, worked for Defendant The Boeing Company for
eighteen years before being fired for an altercation with a supervisor.  Shortly after Vaughan was
rehired under a probationary agreement and assigned a different role, he violated a Boeing
safety-related employee policy multiple times, leading to a three-day suspension.  Once back,
Vaughan ran afoul of employee policies again and was fired for good.  He sued Boeing for race
discrimination and retaliation, and Boeing now moves for summary judgment.  Though it is
always troubling when a veteran employee loses a good, stable job, I find that Vaughan's claims
fail as a matter of law and will therefore grant Boeing's Motion.

### I.    Background

Vaughan began working at Boeing's Ridley Park plant in 1995.  He held different roles
over the years, and in 2007 became a composite fabricator, working with the type of  materials—
like graphite, Kevlar, and resin—that are used to make aircraft.  Specifically, Vaughan did
"deflash," the grinding down of aircraft parts to ensure there are no sharp edges.  Six years into
that role, however, Vaughan got into an altercation with his supervisor and was fired—but after

his union negotiated a settlement, Vaughan was allowed to return to work under the terms of a Last Chance Agreement.  The Agreement required Vaughan to meet regularly with a counselor, Richard Buxton, who worked onsite at Boeing but was employed by a separate counseling company.[1]

The Agreement also provided, in line with its title, that Vaughan was "on notice that any incident, considered to be insubordination, either direct or indirect, will result in his immediate discharge."

**A.  Initial Issues After Vaughan's Return**

Vaughan returned to Boeing on October 11, 2013, still a composite fabricator but now reassigned from deflash to "bonding," which in Vaughan's case entailed attaching fuel bag hangers to aircraft.  He was also put in a new department (working on V-22 Ospreys) and given a new supervisor—Charles Moyer, who is white.  Of the twenty-odd employees who did bonding on V-22 Ospreys under Moyer, Vaughan was the only one who is black.

Vaughan's first assignment back, which continued for almost a month, was sweeping the floor.  The parties disagree about why.  Boeing claims that for safety reasons it usually requires employees to complete trainings and obtain certifications relevant to their type of work before starting.  For Vaughan, who was new to bonding, there were two required certifications, and it took until October 18 for him to obtain the first and until October 31 for the second.  Before the first, he could not do any substantive bonding work at all, and before the second, he could not perform his primary assignment of attaching fuel bag hangers.  So in the meantime, Vaughan was told to sweep—which Boeing maintains was the usual practice.[2]

---

[1] With limited exceptions, conversations with such counselors are confidential.

[2] As Vaughan points out, Boeing's argument here is largely supported not by its employees' deposition testimony, but instead by eleventh-hour affidavits filed by those very

Vaughan gives a different explanation.[3]  The gist of his account is that Boeing thrust him into a new job and did not properly train him to do that job, telling him to sweep instead.  The certifications rationale, Vaughan claims, is just a post hoc excuse that was not given at the time.  Moreover, the training Vaughan was supposed to receive (and needed), from coworkers whom Moyer assigned to help Vaughan learn bonding, never actually happened—in fact, those coworkers acted dismissively toward him.

As a result, Vaughan complained about the lack of training and about having to sweep to multiple people, including Moyer, and raised it during an October 28 counseling session with Buxton.  During that session Vaughan did not directly connect his sweeping complaints to discrimination,[4] but Buxton independently thought it possible that discrimination was the cause and got Vaughan's permission to reveal their otherwise-confidential exchange to Paul Mulholland, Boeing's human resources head.  Buxton told Mulholland only "what Mr. Vaughan had related to" him:  that Vaughan "was spending an unusual amount of time sweeping the floor."  Buxton Dep. 42:3–9.  Although Mulholland then spoke with Vaughan and Moyer about the situation, nothing changed immediately.

---

employees who had already been deposed.  These affidavits strike me as analogous to sham affidavits—the difference being that while that term typically refers to affidavits that "come[] in later to explain away or patch up an earlier deposition in an attempt to *create* a genuine issue of material fact," *In re CitX Corp., Inc.*, 448 F.3d 672, 679 (3d Cir. 2006) (emphasis added), Boeing uses them here to try and *win* summary judgment.  Needless to say, "prior depositions are more reliable than affidavits," *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007), particularly where—as here—"there is [no] independent evidence in the record to bolster an otherwise questionable affidavit," *Baer v. Chase*, 392 F.3d 609, 625 (3d Cir. 2004).  I find counsel's tactic troublesome, and have not relied on any of the affidavits in resolving this Motion.

[3] Vaughan does not dispute that other employees occasionally swept the floor, but claims he had never seen anyone else sweep as much and for as long as he did.

[4] In a response to an interrogatory, however, Vaughan stated that he did tell Buxton that "other employees were not helping him because he was the only Black employee in his shop area."  Boeing Br. Ex. Y ¶ 11.

A few days later, Vaughan finished his last certification, which allowed  him to start attaching fuel bag hangers.  But Vaughan's real gripe continued to be with the lack of hands-on, on-the-job training showing him how to bond—without which, he says, he could not properly perform the job.  When he told Moyer as much, however, Moyer asked him if he was an "idiot." Vaughan took issue, telling his union shop steward about Moyer's comment, and the two filed a report with a Boeing human resources representative.  The head of the local union then met with Moyer's boss, Dennis Garehan, who kept Vaughan in the same job but reassigned him from Moyer to the supervision of Mark Muldowney (also white).  Soon after, Vaughan told Buxton that he was "more optimistic now that he has returned to meaningful work."

**B.  Vaughan's Suspension**

In aircraft manufacturing, Foreign Object Debris (FOD) is any item that is foreign to the part of the aircraft currently under construction.  FOD can be a tool, an extra nut, or even a stray piece of paper.  Because unaccounted-for FOD can ultimately damage an aircraft and cause it to crash, FOD control is a major and constant concern for Boeing.  Boeing therefore requires that its employees, such as Vaughan, complete annual FOD-control training.[5]

With respect to tools, Boeing uses a "chit" system to prevent FOD problems.  A chit is a piece of plastic marked with an employee's identification number.  When an employee removes a tool from his toolbox for use on an aircraft, he must leave a chit in its place; when he is done with the tool, he retrieves the chit.  Any time the employee leaves the worksite, even for a break, he must remove all his tools and any other FOD from the aircraft, and at the end of his shift, he must return all tools to his toolbox and ensure that he has all his chits.  If either a tool or chit is

---

[5] Indeed, shortly before the events in this case, the entire Ridley Park plant was shut down because of multiple FOD incidents.  Vaughan testified that a white employee was responsible for this shutdown but was not terminated.

missing, the employee must tell his manager, and the factory will be shut down until the missing item is found.

Not long after Vaughan had started work under Muldowney (and a month after he was rehired), Muldowney noticed that Vaughan had left FOD on an aircraft while on break. Recognizing that Vaughan was a "new employee" to the V-22 Osprey Department and "unaware of the processes here," Muldowney, together with Garehan, told Vaughan about the issue and gave him an informal coaching session on FOD control. Vaughan was told that future violations could result in a corrective action, which, under the first step of Boeing's progressive-discipline regime, usually means human resources gets involved and a written warning is issued.

A week later, and two days after Vaughan reiterated (this time to Muldowney instead of Moyer) that he needed additional bonding training, Muldowney saw that Vaughan had left tools out on a cart overnight. There is no real dispute that Vaughan did this; what is disputed is why. Vaughan claims that while new employees to an area are typically given a locker to store their tools, he had never been given one, and so he had been leaving his tools on a cart overnight as a matter of course. Vaughan also testified that he observed white employees frequently leaving tools out overnight without facing discipline.[6] Boeing, by contrast, acknowledges the long delay in getting Vaughan a locker, but says this could not have been the reason for Vaughan's noncompliance in this instance, because that very night Vaughan had told Muldowney that he did not have a locker and Muldowney had responded by getting Vaughan both a lock and locker. In any event, Muldowney emailed Raymond Bates, the human resources representative for the V-22 Osprey Department, outlining what had happened, including Vaughan's earlier FOD issue. Because this was a subsequent violation, Muldowney requested "no less than a written warning."

---

[6] Vaughan identified one such employee by name.

As Bates investigated, Vaughan's FOD troubles continued.  Two weeks after Muldowney's email, Muldowney discovered that Vaughan had left paper backing on an aircraft. Muldowney approached Vaughan about it and told him to be more careful, and updated Bates via email.  Two days later, an employee who shared a toolbox with Vaughan told Muldowney that a sander was missing from the toolbox, but there was no chit in its place.  When confronted, Vaughan admitted he had been using the sander, but claimed his chits were at the other end of the building.  Muldowney updated Bates with this news as well.

Finally, on December 18, Boeing issued Vaughan a written warning and a three-day suspension because of his numerous FOD violations.  The disciplinary memo specifically cited each of the above violations except the paper-backing incident.  Both Muldowney and Vaughan signed the memo, although Vaughan again disputed any reference to leaving his tools out on a cart overnight, claiming he had no place to put them.

### C.  Vaughan's Termination

Vaughan returned to work in early January 2014,[7] his future at Boeing uncertain.  Soon after Vaughan got back, Muldowney pointed out that he had made mistakes in attaching certain fuel bag hangers, which required their replacement.  Muldowney told Vaughan that he would not pursue discipline but that this sort of workmanship problem could trigger it—and given Vaughan's prior infractions, discipline likely meant termination.  Vaughan responded that he had "not been given the chance to succeed" and was "being set up to fail."  After giving Vaughan notice, Muldowney then called Buxton to tell him Vaughan was having "difficulties on the job" and recommend that he meet with Vaughan.  When the two met later that day, Buxton noted that Vaughan had "mild anxiety over discipline given him for poor workmanship."

---

[7] Vaughan was out on a medical restriction during the intervening period, the result of a workplace injury he suffered a few days before the December 18 disciplinary action.

Vaughan's problems continued.  Less than a week later, Muldowney emailed Bates and Garehan to ask that Vaughan be disciplined because he had worked unauthorized overtime. Because Boeing's governing collective bargaining agreement sets out specific criteria for distributing overtime, employees cannot work overtime without authorization.  Muldowney, moreover, had reminded his employees that very week that overtime was given by invitation only.  For his part, Vaughan does not dispute any of this, but testified that white employees in his area commonly worked unauthorized overtime (and openly discussed doing so) and were not disciplined.[8]  In a now-familiar pattern, shortly after Muldowney approached Vaughan about the overtime issue, Vaughan met with Buxton, telling him he thought Muldowney was "out to get me."[9]  Vaughan also told Buxton that he had continued to ask for more job training, but to no avail.  Buxton's notes from that session read:  Vaughan "fears job loss."

That fear proved well-founded.  The next day, after Vaughan's shift, Donald Clayton, a manager, and also African American, emailed Muldowney that he had found an unsecured orbital sander on a cart in the bonders' work area.  When Clayton had returned the sander to the toolbox, he found Vaughan's chit in its place.  Unlike with his previous infractions, Vaughan disputes this, claiming he "did not leave anything out" and he was "not the only one with access to that toolbox."  Nevertheless, given the allegation, as well as Vaughan's prior incidents, Muldowney recommended to Bates that Vaughan be fired.  And on January 27, 2014, Boeing did just that, its termination memo specifically citing Vaughan's overtime and sander incidents.

Vaughan thereafter exhausted state and federal administrative remedies.  Significantly, a Boeing internal investigation conducted during that time revealed data regarding employees who

---

[8] Vaughan identified two such employees by name.

[9] In discussing this meeting, Buxton also testified that "Vaughan really is not someone in my judgment that looked to trump up charges."

committed FOD violations—which Vaughan claims show that white violators were consistently disciplined less harshly than similarly situated black and Hispanic violators.

Vaughan sued Boeing for race discrimination and retaliation, bringing claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17; the Pennsylvania Human Relations Act, 43 Pa. Stat. and Cons. Stat. Ann. §§ 951–963; and 42 U.S.C. § 1981.[10]  Boeing moves for summary judgment.

## II.      Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On such a motion, "'[a]ll reasonable inferences from the record must be drawn in favor of the nonmoving party' and the court 'may not weigh the evidence or assess credibility.'" *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (alteration in original) (citation omitted).  But if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," there is no genuine issue of any material fact and the moving party is entitled to summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## III.     Discussion

I ultimately conclude that Boeing's Motion should be granted because both Vaughan's discrimination and retaliation claims fail as a matter of law.

---

[10] For present purposes there is no difference between these statutes, as the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs claims under each.  *See Jones v. Sch. Dist.*, 198 F.3d 403, 410 (3d Cir. 1999).

### A. Discrimination Claims

Title VII forbids an employer "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e–2(a)(1).  Under *McDonnell Douglas*'s three-step framework, (1) a plaintiff must first establish a prima facie case of discrimination; (2) if he does, the employer must give a legitimate reason for its conduct; and (3) if the employer meets its burden, the plaintiff must show the employer's reason is pretext. *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 325–26 (3d Cir. 2015).  I take each step in turn.

### 1. *Prima Facie Case*

To establish a prima facie case of discrimination under Title VII, a plaintiff must show that (1) he belongs to a protected class, (2) he was qualified for the position, (3) he was subject to an adverse employment action despite being qualified, and (4) the circumstances support an inference of discrimination.  *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).  Because Boeing concedes the first three elements (with the adverse employment actions being Vaughan's three-day suspension and termination), the only question for me is whether the record supports an inference of discrimination.

For this Vaughan offers four pieces of evidence.  First, that he was assigned to sweep far in excess of what white employees were ever required to do.  Second, that he was never trained properly for his job as a bonder.  Third, that white employees committed FOD violations and did not face significant, if any, discipline.  Finally, that white employees worked unauthorized overtime and were not disciplined.[11]

---

[11] Comparator evidence is usually analyzed under the pretext step of the analysis, *see Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643–45 (3d Cir. 1998), but since it

I find there is enough here to create a discriminatory inference, but it is marginal, and most of Vaughan's evidence does not take him very far.  Take sweeping first.  To start, Vaughan claims "the evidence is undisputed that [he] was assigned sweep duty far in excess of what may have been required of his non-Black coworkers."  Notably, Vaughan fails to support that with any citation to the record.  And to the extent Vaughan testified that he observed no white employees sweeping to the same extent as he did, he does not make any showing that these white employees were "similarly situated" to him—that is, had recently been hired into a new role and were awaiting certification.  Key to the question whether employees are similarly situated is whether there are any "differentiating or mitigating circumstances as would distinguish . . . the employer's treatment of them."  *McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011) (quoting *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617–18 (7th Cir. 2000)).  Thus, without passing on the *validity* of Boeing's certifications justification, I find it a factor distinguishing Boeing's treatment of Vaughan.  So as far as sweeping goes, Vaughan points to no one else similarly situated but treated differently.

Moving past comparators but still on sweeping, Vaughan claims there is no evidence that Boeing's certifications were actually required to do bonding or fuel bag hanging work, and, in any case, this justification for his menial assignments was never given at the time.  As a surface matter, it does seem that, regardless of whether Vaughan needed certifications or not, roughly a full month is a long time for a nearly twenty-year employee to be told to sweep.  But ultimately I find this dispute immaterial because Vaughan's sweeping has little if anything to do with this case:  Vaughan was suspended and fired long after his sweeping assignments stopped, long after he had been transferred to a new supervisor, and long after he had—as he says—resumed

---

also goes to whether there is an inference of discrimination, it can be viewed as part of the prima facie case, *see id.* at 646.  In line with how the parties have briefed it, I will thus consider it here.

"meaningful work."  Moreover, he was suspended and fired for compliance infractions wholly
unrelated to sweeping.  So nothing about sweeping creates a discriminatory inference.

The same reasoning applies to Vaughan's lack-of-training claim.  The record is clear that
Vaughan continually asked for more training over nearly his entire tenure as a bonder.  But
Vaughan was neither suspended nor fired for his *performance* (as each disciplinary memo
indicates), and his only performance-related incident—failing properly to attach fuel bag hangers
in early January 2014—led to nothing more than an admonition from Muldowney.  Vaughan's
claim that Boeing did not train him therefore has nothing to do with the discipline he faced, and
fails to create a discriminatory inference.[12]

Each of Vaughan's last two pieces of evidence of intent relies on disparate treatment of
white comparators:  he claims that white employees both (1) committed FOD violations and (2)
worked unauthorized overtime without facing the same discipline he did.  Starting with FOD-
violator comparators, Vaughan is incorrect in claiming that his "testimony alone that he observed
FOD violations by non-Black employees that did not result in discipline is sufficient" to get past
summary judgment.  Vaughan only identifies by name one such employee, and the Court of
Appeals has cautioned against "selectively choos[ing] a comparator," holding (in the age
discrimination context) that a "decision adversely affecting an older employee does not become a
discriminatory decision merely because one younger employee is treated differently."
*Simpson*, 142 F.3d at 645–46.  Instead, the evidence must be viewed as a whole.  *Id.*  Here, the
records from Boeing's internal investigation (Doc. 23-13 at 240–50)—which Vaughan elsewhere

---

[12] Vaughan additionally emphasizes, but does not press as evidence of discriminatory
intent, that Moyer called him an "idiot" nearly three months before he was fired.  Although I
believe courts should hesitate to dismiss racist comments as mere "stray remarks," *Ezold v. Wolf,
Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992), the epithet used here was
universal in character, not racially based, and significantly remote in time from Vaughan's
termination.

relies on—show that whites *were* disciplined for FOD violations.  Those records list all nine

other composite fabricators at Ridley Park who were formally disciplined for FOD violations

during the three-year period ending shortly after Vaughan's termination.  Seven were white, one

was black, and one was Hispanic.[13]  These data do not render Vaughan untruthful, but they do

show that the cumulative evidence regarding how FOD violators were disciplined does not

support a discriminatory inference.

Unauthorized-overtime comparators are a slightly different matter.  Here, Vaughan offers

*two* white employees, by name, who he says openly talked about taking unauthorized overtime

without facing discipline.  Moreover, unlike in the FOD-violator context, the record contains no

data clearly establishing that white employees who took unauthorized overtime faced discipline.

And Boeing's argument that I may not consider Vaughan's testimony about what his two white

coworkers said because it is inadmissible hearsay is unavailing, as Federal Rule of Evidence

801(d)(2)(D) excludes from hearsay statements that are offered against a party and "made by the

party's . . . employee on a matter within the scope of that relationship and while it existed."[14]  To

be sure, I recognize the sum total of this evidence is thin—for instance, Vaughan makes virtually

no showing that the two white employees were "similarly situated" to him in the sense of having

---

[13] Differences in the specific disciplines given are addressed below under pretext.

[14] The obvious rejoinder to this is that the employee statements in question involve *violating* Boeing's policies and thus cannot fairly be said to be on a matter within the scope of employment.  But I find such an interpretation of Rule 801(d)(2)(D) too narrow, because one of the key allegations in this case is that Boeing *allowed* such violations to occur.  Additionally, I note that the traditional, agency-based view of "scope of employment"—under which, "[s]ince few principals employ agents for the purpose of making damaging statements, the usual result was exclusion"—has since given way to a "substantial trend [that] favors admitting statements [merely] *related to a matter* within the scope of the . . . employment."  Fed. R. Evid. 801(d)(2)(D) advisory committee's note (emphasis added).  In the context of what is alleged here, I think it is plain that the employees' statements regarding their adherence (or lack thereof) to Boeing's overtime policies were "related to a matter" within the scope of their employment.

the same existing record of disciplinary infractions that he had.[15]  Nonetheless, establishing a

prima facie case is not meant to be "onerous," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

248, 253 (1981), and because I find there is enough evidence of disparate treatment regarding

unauthorized overtime to create a discriminatory inference, Vaughan has made out such a case.

      2.  *Legitimate Nondiscriminatory Reason*

As Vaughan concedes, Boeing has plainly met its light burden of articulating a legitimate

nondiscriminatory reason for suspending and terminating Vaughan:  his repeated violations of

FOD rules and his violation of unauthorized-overtime rules.

      3.  *Pretext*

At this stage, "the burden shifts back to the employee, who, to defeat a motion for

summary judgment, must show that the employer's articulated reason was a pretext for

intentional discrimination."  *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008).

To do this, the plaintiff "must point to some evidence, direct or circumstantial, from which a

factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or

(2) believe that an invidious discriminatory reason was more likely than not a motivating or

determinative cause of the employer's action."  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.

1994).

Vaughan fails to make this showing.  He puts forth four pieces of evidence of pretext.

First, he again points to the data from Boeing's internal investigation identifying other FOD

violators.  He correctly notes that although the seven white employees were disciplined, they

were all given written warnings, while the black employee was suspended and the Hispanic

employee fired.  But a closer look reveals a nondiscriminatory explanation:  the white employees

---

[15] Compare, in this respect, *Maull v. Division of State Police*, 39 F. App'x 769, 773–74
(3d Cir. 2002).

were all first-time offenders, while the black employee had previously received a written warning and the Hispanic employee had previously received both a written warning and three separate suspensions.  Given Boeing's progressive-discipline system, these outcomes are logical; at the very least, the data fail to show that white employees were treated better than similarly situated black and Hispanic employees.

Next, Vaughan refers back to his sweeping assignments, arguing that Boeing's "shifting explanations" for why Vaughan was given those assignments should cast doubt on the reasons put forward for Vaughan's suspension and termination.  A plaintiff may indeed show pretext by identifying "such . . . inconsistencies . . . in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (emphasis omitted) (quoting *Ezold*, 983 F.2d at 523).  But Vaughan has not done this.  Any inconsistencies about why he was *assigned to sweep* (that is, whether Boeing's certifications excuse is true or false) are wholly unrelated to Boeing's "proffered legitimate reasons for its action"—that is, why it *suspended* and *fired* Vaughan.  Those reasons are separate and clear from the record:  Vaughan's multiple compliance failures.  As Vaughan has not identified any inconsistencies in those reasons, he has not shown pretext.

Third, Vaughan claims the fact that he worked for Muldowney for less than two months shows he was never given a chance to succeed and instead that Muldowney "was intent on finding a way to terminate him."  But Vaughan's multiple—and undisputed—violations during those two months were for non-performance-related work rules, rudimentary matters of workplace order and safety.  As to such matters, it is generally "the prerogative of the employer . . . to determine what constitutes a breach of protocol and the consequences that follow." *Fasold v. Justice*, 409 F.3d 178, 193–94 (3d Cir. 2005).  So the shortness of the time that

14

Vaughan worked for Muldowney, when viewed against the nature of Vaughan's breaches of protocol during that time, does not show pretext.

Finally, Vaughan claims that Buxton's stated positive view of Vaughan's credibility (developed through multiple counseling sessions) supports his testimony regarding similarly situated white employees being treated differently. Necessarily, however, I have applied throughout my analysis the fundamental precept that on summary judgment the "evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Even accepting Vaughan's version of events, I conclude he has failed to show pretext. For this reason, his discrimination claims fail as a matter of law.

### B. Retaliation Claims

Vaughan also claims Boeing retaliated against him because he made sweeping-related complaints to Buxton, which Buxton then communicated to Mulholland, the Boeing human resources head. These claims similarly fail. Title VII's antiretaliation provision "forbids employer actions that 'discriminate against' an employee . . . because he has 'opposed' a practice that Title VII forbids." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e–3(a)).[16] Retaliation claims also follow the three-step *McDonnell Douglas* framework, *see Daniels*, 776 F.3d at 193, but here I need go no further than the prima facie case to reject Vaughan's claims.

To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in protected activity, (2) his employer took adverse action against him, and (3) there is a causal connection between the protected activity and the adverse action. *Id.* Only the protected-activity

---

[16] As with substantive discrimination claims, retaliation claims under the PHRA, *see Daniels v. Sch. Dist.*, 776 F.3d 181, 192–93 (3d Cir. 2015), and § 1981, *see Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010), are governed by the same standard as Title VII retaliation claims.

and causation prongs are relevant here, as plainly Boeing took adverse actions against Vaughan. As to protected activity, both parties agree Vaughan engaged in it, even though they define the activity differently.

But it is immaterial how the relevant activity is viewed, because Vaughan cannot show that either form of activity was the cause of his suspension or firing.  The reason is simple:  there is nothing in the record to suggest that Vaughan or his counselor ever communicated anything to anyone at Boeing about any allegation of discrimination.  As Buxton testified, the *only* thing he told Mulholland about his otherwise-confidential sweeping-related exchange with Vaughan was "what Mr. Vaughan had related to" him:  he "was spending an unusual amount of time sweeping."  Nothing more was said.  Vaughan fails to show that anyone at Boeing, let alone the decision makers in his suspension and firing (Muldowney and Bates), had any knowledge either that (1) Vaughan told Buxton he felt unfairly treated because he was the only black employee in his area, or (2) about Buxton's belief that Vaughan's sweeping assignments were possibly connected to discrimination.

"[F]or protected conduct to be a . . . factor in a decision, the decisionmakers must be aware of the protected conduct."  *Ambrose v. Township of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002).[17]  Here, because Vaughan cannot show this, he instead asks me to "infer from the facts related to" the Buxton–Mulholland exchange that Mulholland next told Garehan that "Vaughan believed he was being discriminated against," and finally Garehan conveyed that view to Muldowney.  But that asks me not only to "heap inference upon inference," *Antol v. Perry*, 82 F.3d 1291, 1297 (3d Cir. 1996), but to assume without any evidence that Mulholland somehow

---

[17] I note that it is no longer sufficient for protected activity to be merely one factor in the decision; rather, "retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013).

knew that Vaughan had engaged in protected activity.  On summary judgment, the entitlement of the non-moving party is limited to all "reasonable" inferences.  *Hampton v. Borough of Tinton Falls Police Dep't*, 98 F.3d 107, 112 (3d Cir. 1996).  Following Vaughan's suggested approach would be a bridge too far.  For this reason, Vaughan fails to show a causal connection between his protected activity and his suspension or termination, and thus fails to establish a prima facie case of retaliation.

### IV.  Conclusion

Boeing's Motion for Summary Judgment will be granted and Vaughan's discrimination and retaliation claims will be dismissed.  An appropriate order follows.


<u>      /s/ Gerald Austin McHugh</u>
United States District Judge

17